**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

*FILED*
*NOV 6 2014*
*U.S. DISTRICT COURT-WVND*
*CLARKSBURG, WV 26301*

ROBERT P. PUMPHREY, II,

      **Plaintiff,**

v.                   **Civil Action No. 3:14CV71**
                              **(The Honorable Gina M. Groh)**

COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Robert P. Pumphrey ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for

judicial review of the final decision of the Commissioner of the Social Security Administration

("Defendant," and sometimes "the Commissioner") denying the Plaintiff's claim for disability

insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision

on cross motions for summary judgment and has been referred to the undersigned United States

Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28

U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for DIB on February 7, 2012, alleging disability since May 28,

2011, due to post "methicillin-resistant staphylococcus aureus ("MRSA")" chronic lung damage,

post-surgery lung damage, phlebitis, depression, high susceptibility to bacterial/viral infections,

lower back pain caused by a past work injury, anxiety, and alcoholism  (R. 212, 236).[1]  Plaintiff's

applications were denied at the initial and reconsideration levels (R. 108-119).  Plaintiff requested

---

[1] In his brief, Plaintiff's claims only concern the medical evidence regarding physical
impairments.  Accordingly, the undersigned has only included medical evidence regarding
physical impairments in the statement of facts below.

a hearing, which Administrative Law Judge Regina Carpenter ("ALJ") held on February 25, 2014 (R. 41). Plaintiff, represented by counsel, Brian Bailey, testified on his own behalf (R.48-71). Also testifying was Vocational Expert William Reed ("VE") (R. 71-78). On March 7, 2014, the ALJ entered a decision finding Plaintiff was not disabled (R. 18-35). Plaintiff appealed the ALJ's decision to the Appeals Council, and on May 20, 2014 the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (1-5).

## II. FACTS

Plaintiff was born on October 26, 1965, and was forty-eight (48) years old at the time of the administrative hearing (R. 212). He has a college education and past relevant work as a deli/bakery clerk (R. 237).

On May 14, 2011, Plaintiff was injured at work at a grocery store; he inhaled vapors from a vat where he was frying chicken. He had difficulty breathing (R. 342-50, 380, 390-99).

Plaintiff presented to the emergency department at United Hospital Center ("UHC") with complaints of a moderate cough (R. 329, 368, 419-26). He was diagnosed with bacterial pneumonia and alcohol withdrawal and was admitted to United Hospital Center on May 16, 2011 (R. 335, 359-63, 374, 400, 429, 670). He was diagnosed with pneumonia, diarrhea, chronic obstructive pulmonary disease ("COPD"), tobacco abuse, alcohol abuse, marijuana abuse, and hypokalemia. Plaintiff was treated with broad spectrum antibiotics and had "improved quite nicely" (R. 320, 400-04). Plaintiff's chest x-ray showed dyspnea and a mass in the left base (R. 333-34, 339-40, 372-73, 378-79, 405-06, 427-28). Plaintiff was discharged on May 20, 2011 (R. 321, 670).

Plaintiff was admitted to UHC on May 28, 2011, for "empyema secondary to pneumonia from streptococcal pneumoniae, penicillin resistant"; tobacco abuse; and history of hypertension.

Plaintiff medicated with Avelox and Lactobacillus (R. 433, 672). Plaintiff complained of shortness of breath, severe night sweats, anorexia, malaise, and dyspnea on exertion (R. 435). Plaintiff had markedly decreased sounds on the left, pursed lip breathing, and no thoracoabdominal asynchrony. The remainder of Plaintiff's examination was normal. His CT scan of the chest showed "a very large left pleural effusion which appeared loculated and new from April 12, 2010, [and] severe atelectasis in the left lung" (R. 436, 442, 470). Another scan of his chest revealed "[n]o pneumothorax" and a "[l]arge left lung consolidation consistent with pneumonia" (R. 444).

On May 31, 2011, while at UHC, Plaintiff had a consultation with Dr. Adeniyi for an evaluation for a chest tube placement (R. 438). After that consultation, Dr. Adeniyi assessed left parapneumonic effusion with empyema. He planned to place a chest tube in Plaintiff (R. 439). That same day, Dr. Adeniyi performed a left closed tube thoracostomy drainage on Plaintiff. He noted that Plaintiff tolerated the procedure "well" (R. 440-41). That same day, a CT scan of Plaintiff's chest detected no pneumothorax, but did show that a "[l]arge left pleural density persist[ed]" (R. 446).

On June 1, 2011, a CT scan of Plaintiff's chest revealed a "[m]inimal decrease in left pleural density from prior day" (R. 447). Two days later, the same scan showed "[n]o interval change from June 1, 2011 noted. Left-sided chest tube in place with consolidative process and pleuroparenchymal reaction left base" (R. 448). On June 4, 2011, the CT scan noted a "[l]eft base pleural-parenchymal reactive change and lower lung infiltrate suspected however the aeration has improved from yesterday" (R. 449). On June 6, 2011, Plaintiff had a "[s]table exam with left basilar consolidation and left pleural effusion. No interval change" (R. 450). A day later, the CT scan showed "[u]nchanged consolidation and pleural fluid on the left" (R. 451). On June 8, 2011, Plaintiff's CT

scan was a "[s]table exam with left pleural effusion and left lung consolidation" (R. 452). Upon discharge that same day, Dr. Angotti noted Plaintiff was positive for thoracentesis growing steptococcal pneumoniae and had been prescribed Avelox after he had completed a ten (10) day intravenous course of Vancomycin and Avelox (R. 433, 512.)

Plaintiff underwent an X-ray of his chest on June 15, 2011, at UHC. Dr. Koay's impression was as follows: "Continued loculated left pleural effusion with airspace disease in left lung base. This could represent continued pneumonia. Additional followup is recommended" (R. 567).

On June 22, 2011, Plaintiff was admitted to UHC with "a draining mass under his left axilla." The mass was "painless" (R. 473). Plaintiff reported that he had been scheduled for an ultrasound, but that the mass had "spontaneously resolved." However, it had "reaccumulated and began to drain externally through the scar." The mass was located near where his chest tube had been inserted during his prior stay at UHC. Plaintiff was started on intravenous Avelox (R. 474, 508-09). Upon admission, Dr. Angotti diagnosed "probable pleural cutaneous fistula" (R. 475-76, 510). That same day, Plaintiff underwent a CT scan of his chest, which showed "[p]ersistent left lower lobe opacity as described not significant change from recent study June 15, 2011." There was a "[p]ersistent pleural density left mid to lower lateral chest which appear[ed] to represent loculated effusion and left base consolidation atelectasis" (R. 478, 490).

Two days later, on June 24, 2011, Plaintiff underwent another CT scan of his chest. Dr. Koay, the physician who performed the CT scan, noted a "[l]oculated left pleural effusion" and that there may have been "2 separate loculated components, one which contain[ed] small amount of air." He also noted that the scan was positive for "[l]eft lower lobe airspace disease" (R. 479-80, 481-82). In an addendum, Dr. Koay also noted a "[v]ery small pericardial effusion . . . which is new" (R. 482).

4

That same day, Plaintiff was transferred to Ruby Memorial Hospital for "possible decortication" (R. 474, 509).

Plaintiff was admitted to Ruby Memorial Hospital on June 24, 2011, with a diagnosis of empyema thoracis (R. 514, 683). The next day, X-rays of Plaintiff's chest were obtained. Dr. George Ciporkin noted: (1) "Presence of a moderate-to-large sized left pleural effusion present in conjunction with opacification involving the left mid and lower lung zones and complete obscuration of the left hemidiaphragm, which is likely at least in part reflective of the presence of associated compressive left pulmonary atelectasis"; and (2) "Mild blunting of the right lateral costophrenic sulcus, which may be reflective of the presence of a right pleural effusion" (R. 539-40).

On June 27, 2011, Dr. Olusola Oduntan performed a flexible bronchoscopy, left thoracotomy, drainage of empyema, and complete left lung decortication (R. 517, 518-21, 555-57, 680-81, 685). After that procedure, Plaintiff was transported to the intensive care unit in stable condition (R. 517, 681, 685). That same day, an X-ray of Plaintiff's chest showed: "1. Postoperative changes of left thoracotomy with placement of 2 large-bore chest tubes and decreased size of left pleural effusion. 2. Possible consolidative process involving the left base. 3. Cardiac enlargement without pulmonary edema." A day later, on June 28, 2011, an X-ray of Plaintiff's chest demonstrated: "1. Stable cardiomegaly without pulmonary edema. 2. Postoperative changes of left thoracotomy with decreasing left pleural effusion. 3. Atelectasis or infiltrate in the left lung and linear atelectasis in the right lung" (R. 540, 560-61).

An X-ray of Plaintiff's chest taken on June 29, 2011, showed the following: (1) "Interval increased subcutaneous emphysema projecting lateral to the left chest wall, and there may be a left lateral pneumothorax with no radiographic evidence of associated tension"; (2) "Presence of a

shallow inspiration, and there are persistently increased pulmonary markings involving the left mid and lower lung zones, which are unchanged, which may be at least in part reflective of the presence of atelectatic changes, likely present in conjunction with a residual left pleural effusion"; (3) "Persistent, but decreased right basilar pulmonary markings, likely reflective of resolving atelectasis"; and (4) "Stable cardiac enlargement, but the peripheral pulmonary vasculature is within normal limits" (R. 541). A second view, taken later that day for purposes of placement of Plaintiff's PICC line, showed "[s]table cardiac enlargement, chest tube placement, subcutaneous emphysema and left-sided fluid and atelectasis compared to prior examination at 0222 hours" (Id.; 559).

The X-ray of Plaintiff's chest taken on June 30, 2011, revealed: (1) "Persistent subcutaneous emphysema projecting lateral to the left chest wall, but currently there is no radiographic evidence of a visible right or a left pneumothorax"; (2) "Presence of a shallow inspiration, and there are persistently increased pulmonary markings involving the left mid and lower lung zones with obscuration of the left hemidiaphragm, reflective of the presence of atelectatic changes present in conjunction with a left pleural effusion"; and (3) "Stable cardiac enlargement, but the peripheral pulmonary vasculature is within normal limits." The same view, taken a day later, showed "[p]ostoperative changes in the left with chest tubes in place. No visible pneumothorax. Improved aeration at the left base medially. Stable cardiac enlargement" (R. 542, 558-59).

Plaintiff's chest X-rays from July 2 and 3, 2011, were "[s]table interval examination[s] of the chest" (R. 542, 558). The same view, taken on July 4, 2011, demonstrated "[p]ost removal of 1 chest tube and no pneumothorax is seen." On July 5, 2011, Plaintiff's left chest tube was removed with "trace pneumothorax at the left apex. Residual fluid and atelectasis on the left and mid cardiac enlargement unchanged" (R. 543, 557-58).

Home health for IV antibiotics and wound packing to Plaintiff's former chest tube site was arranged, and Plaintiff was discharged from Ruby Memorial Hospital on July 6, 2011 (R. 514, 517, 685). Upon discharge, Plaintiff was prescribed hydrocodone-acetaminophen, fursemide, potassium chloride, vancomycin, moxifloxacin, metoprolol, olmesartan, and aspirin (R. 515).

On July 18, 2011, Plaintiff had a follow-up appointment with Dr. Oduntan as part of the thoracic surgery outpatient clinic at Ruby Memorial Hospital. Plaintiff reported "doing well" since his discharge. He felt "much stronger" and was "moving around more easily." Plaintiff was not experiencing any "chest pain or undue shortness of breath." He only felt "some numbness of the skin beneath the left breast." Upon examination, Dr. Oduntan noted that Plaintiff's left thoracotomy incision was healing well and that his discharging wound had closed (R. 570). While there, Plaintiff had an X-ray of his chest taken. Dr. Robert Tallaksen's impression was as follows: "Resolution of right apical pneumothorax and subcutaneous emphysema on the left compared to prior examination of 5 July 2011. Borderline cardiac enlargement, left pleural effusion and postoperative changes in the left, all appear stable from the prior study. No new abnormality" (R. 566, 569). Dr. Oduntan directed that Plaintiff complete his four-week course of IV Vancomycin on July 24, 2011, and that his home health nurse remove his PICC line thereafter (R. 570). Plaintiff was to follow up again in two (2) months (R. 571).

On August 29, 2011, Plaintiff saw Dr. Robert Snuffer with complaints of being short of breath. Plaintiff reported that his shortness of breath was "significant with exertion" and that he was up to walking half a mile but got "wiped out afterwards." Upon examination, Dr. Snuffer noted "no breath sounds in left base, otherwise clear, no pain with breathing." He diagnosed hypertension, hyperlipidemia, gout, pain in limb, internal derangement of knee NOS, tear in the medial meniscus

of knee, laceration, influenza, acute bronchitis, and seasonal allergic rhinitis (R. 678-79).

Plaintiff had a follow-up appointment with Dr. Oduntan on September 19, 2011. Plaintiff reported that since his last visit, he had been "doing well" and that his life was "'now back to normal.'" He was "fully functional" but had not yet returned to work; he planned to return to work on September 28, 2011. Plaintiff had a new complaint of dull pain in his left shoulder, which started three (3) days ago. Taking ibuprofen helped resolve the pain (R. 573). Upon examination, Dr. Oduntan noted that Plaintiff's left thoracotomy incision was "well healed" and that his lungs were clear bilaterally but "slightly reduced over left base" (R. 574). While there, Plaintiff had an X-ray taken of his chest. Dr. Tallaksen noted "[s]table postoperative changes and borderline heart size. Residual pleural fluid on the left, unchanged from 18 July 2011. No new abnormality" (R. 571, 572). Dr. Oduntan noted that Plaintiff was "doing well following decortication of left empyema thoracis." He was "back to baseline and continue[d] to improve." Plaintiff was discharged from the clinic, and Dr. Oduntan noted that it was ok for Plaintiff to return to work the following week as planned (R. 574).

Plaintiff saw Dr. Snuffer on November 29, 2011. He reported that he was still weak following his surgery. Plaintiff was able to walk up to a mile but had to rest "for some time after." He was not "back up to full strength." Plaintiff believed that his endurance was better and thought that he was ready for physical therapy. Upon examination, Dr. Snuffer noted that Plaintiff's chest still had some rhonchi in the left base. He assessed MRSA, hypertension, and lung laceration without mention of open wound into thorax. He prescribed Metoprolol and Benicar; referred Plaintiff to physical therapy, and instructed Plaintiff to follow up in two (2) months (R. 575-76).

Plaintiff began physical therapy on January 10, 2012, at Stonewall Jackson Memorial

Hospital. His goal was to "get back to how [he] felt and acted prior to surgery." Plaintiff's current pain was a zero (0) out of ten (10); he could go two (2) to three (3) days without experiencing pain. At its worst, his pain was a six (6) or seven (7). Sleeping on his left side and running made Plaintiff's pain worse; it was relieved with heat. Physical therapist Kelley Buckman noted the following problems for Plaintiff: (1) decreased bilateral hip flexor strength; (2) decreased strength throughout; (3) decreased endurance; and (4) decreased ambulation distance. Plaintiff was to attend physical therapy two (2) times a week for ten (10) to twelve (12) weeks. His treatment was to include "strengthening exercises, such as leg press, incline press, rows, military press, standing marches, hip abduction, etc. Treatment also to include endurance training on Nustep and treadmill" (R. 579-86).

Plaintiff saw Dr. Snuffer again on February 2, 2012. He reported that he had been participating in physical therapy and was "slowly getting better;" however, he still had "some pain and endurance issues." Plaintiff complained of experiencing insomnia once or twice a week; getting to sleep was difficult but once he fell asleep he was fine. Dr. Snuffer noted a normal examination of Plaintiff. He assessed hypertension, lung laceration without mention of open wound into thorax, fatigue, and insomnia. He instructed Plaintiff to continue physical therapy and not to return to work until physical therapy finished "in late March;" if Plaintiff was then "ok" he could "go back part time or light duty" (R. 577). Dr. Snuffer prescribed Trazodone for Plaintiff's insomnia and instructed him to follow up in late March (R. 578).

Plaintiff completed a Function Report–Adult on April 29, 2012. He reported that for his daily activities, he got up, dressed, ate breakfast, fed his cat, did light housework, checked Facebook, took several short walks, visited friends, and at times did laundry. Plaintiff needed to rest "a lot"

during the day. His conditions affected his sleep because of the anxiety and depression he experienced. Trazodone had not "been much help" for Plaintiff's sleep. Plaintiff's conditions did not affect his personal care, but he did get dressed "much slower" than before (R. 259). He prepared soup, salads, sandwiches, and microwave dinners daily. Plaintiff used to cook more but found it "too exhausting." Plaintiff did light housework but had to rest "frequently"; he could only vacuum one room at a time (R. 260). He did not do yard work because he was "very sensitive to pollen, dust and allergies." Plaintiff went outside three (3) to four (4) times daily. He had quit driving because he was unable to afford gas. Plaintiff shopped for groceries once every two (2) weeks. He could pay bills, count change, handle a savings account, and use a checkbook and money orders (R. 261).

Plaintiff's hobbies included reading, television, puzzles, games, Facebook, Xbox 360, games, and "surfing the Net." He did these hobbies daily, but he tired "more quickly" and had "bad bouts of depression" where he did "nothing." Plaintiff spent time with others through phone, text, and Facebook; he visited friends a few times weekly. He went out for groceries and to eat with friends (R. 262). He did not have any problems getting along with others, but felt that he was being "socially ostracized" because people avoided him after his MRSA infection. Plaintiff could walk half a mile before needing to stop and rest for at least ten (10) minutes (R. 263).

Plaintiff underwent an X-ray of his lumbar spine on June 7, 2012, at Stonewall Jackson Memorial Hospital. Dr. Migaiolo noted "[m]oderate-advanced degenerative changes L5-S1. No acute bony abnormality." Plaintiff did show "mild degenerative changes at the thoracolumbar junction with osteophytosis" and "facet arthrosis of the lower lumbar levels" (R. 594).

On June 7, 2012, Plaintiff saw Dr. Bennett Orvik for a consultative examination. Dr. Orvik noted that Plaintiff was alert, oriented, and appropriate. Plaintiff had not worked for almost a year,

since his surgery in June 2011 (R. 595). Plaintiff reported problems with varicose veins in his legs, "which [were] swollen a good bit and sometimes painful." Plaintiff had a hard time "walking and standing;" he was "too short of breath to be able to do much work." He described his pain as a sharp pain located in his left chest. Plaintiff experienced constant pain and rated his worst pain as an eight (8) or nine (9) on a ten-point scale. He reported a history of alcoholism; Plaintiff had stopped drinking about one (1) year ago around the time when he contracted pneumonia (R. 596).

Upon examination, Dr. Orvik noted that Plaintiff's "[b]ody habitus and nutritional status show mild-to-moderate obesity." Plaintiff had "decreased breath sounds on the left" side of his chest (R. 597). He also had "multiple small and large varicose veins of both legs, right being worse than the left." These were located in the calves and thighs. Plaintiff's sensory examination was "unremarkable"; he had 5/5 muscle strength in his arms and legs. His straight leg raise test was normal bilaterally in both the supine and sitting positions. Plaintiff's range of motion was normal except for "mild decrease in abduction on the left at 130 degrees." He tandem walked "well," was able to bend to 90 degrees, and performed "three-fourth of a squat and rose from a squat without difficulty." Plaintiff had "mild difficulty" getting on and off the examination table. He reported that he could dress and undress without any problems. Dr. Orvik conducted pulmonary function testing, which showed "forced vital capacity of 108% of predicted and forced expiratory volume at one second was 33% of predicted. After aerosol treatment, forced vital capacity was 100% of predicted and forced expiratory volume at one second was 48% of predicted." Such was classified as a "severe obstruction with significant improvement with the aerosol treatment" (R. 598, 603).

Dr. Orvik diagnosed severe obstructive lung disease, depression, alcoholism, and hypertension (R. 598). As to limitations, sitting was "not a problem" for Plaintiff. Based upon

Plaintiff's own reports, Dr. Orvik noted that Plaintiff could stand for a little over an hour; could walk for maybe half a mile; could not do much lifting and carrying; and could handle objects with his hands without problem. In sum, Dr. Orvik stated that Plaintiff "claims that he has too much pain and difficulty to be able to work. He does have college degrees in biology and chemistry, so there is some potential for a non-physical job some time in the future" (R. 599).

On June 13, 2012, Dr. Fulvio Franyutti conducted an assessment of Plaintiff's physical residual functional capacity. He determined that Plaintiff could occasionally lift and carry twenty (20) pounds; frequently carry ten (10) pounds; sit, walk, and stand for six (6) hours out of an eight (8)-hour workday; and was unlimited in pushing and pulling (R. 104-05). Plaintiff could occasionally climb ramps and stairs, balance, stoop, knee, crouch, and crawl; he needed to avoid climbing ladders, ropes, and scaffolds. Dr. Franyutti found that Plaintiff needed to avoid concentrated exposure to extreme cold and heat (R. 105). He also needed to avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, hazards, and heights. Dr. Franyutti determined that Plaintiff could perform light work "with limitations" (R. 106).

On July 30, 2012, Plaintiff saw Dr. Snuffer with complaints of breathing problems. He stated that his problems had begun at the end of May. Walking made it harder for him to breathe, and "rainy weather and humidity" made them worse. He also indicated that he had been experiencing some chest pain. Upon examination, Dr. Snuffer heard wheezes "in the base of the right and left lung fields." He diagnosed COPD and adjustment disorder with depressed mood, planned for Plaintiff to undergo a pulmonary function test, prescribed Zoloft, and instructed Plaintiff to follow up in four (4) months (R. 606-07, 695).

On September 3, 2012, Dr. Dominic Gaziano completed an assessment of Plaintiff's physical

12

residual functional capacity. He affirmed Dr. Franyutti's findings from June 13, 2012 (R. 116-18.)

On December 27, 2012, Plaintiff saw Nurse Practitioner ("NP") Miral Gibson at Weston Family Medical Care with complaints of dry patches on his skin. Plaintiff had not taken his blood pressure medication for over a month because he had no insurance or financial resources to purchase it. Plaintiff reported that his depression was "worsening" but that he could not afford to see a counselor or buy medications. Plaintiff had developed "very itchy" "thick areas of dry skin on his upper and lower legs." He had scratched "so much" that he had developed "thick plaque in areas on the right shin." Upon examination, NP Gibson noted that Plaintiff appeared "dyspnec but denie[d] feeling short of breath." He had "bounding pulses" in his upper extremities and "variscosities" on both lower legs. NP Gibson noted that Plaintiff had a "few scattered wheezes." As to his skin, Plaintiff had "[m]ultiple areas of leathery, dark red skin with silver plaque on the right thigh, right shin, and left shin." The areas on the right thigh and left shin were "quarter sized"; those on the right shin were "2.5" x 2"." They were "puritic to touch"; Plaintiff had noticed them a month ago, and they were "getting worse and spreading." NP Gibson assessed Hypertension, HLD hyperlipidemia, lichen simplex chronicus, and depression. NP Gibson prescribed Bystolic, Micardis, Clonidine, Viibryd, and Triamcinolone acetonide ointment and instructed Plaintiff to follow up in three (3) weeks (R. 661-62, 693-94, 697-98).

Plaintiff saw NP Gibson with complaints of high blood pressure on January 2, 2013. He reported that he continued to have "high blood pressure running 180/190-95-115." Plaintiff occasionally experienced headaches; he had been taking Bystolic and Micardis as directed. Upon examination, NP Gibson noted "scattered wheezing throughout lung fields." Plaintiff's biopsy site was "healing well," but he continued to have "thick itching patches on the shins and right thigh."

NP Gibson diagnosed hypertension, increased Plaintiff's Bystolic dosage, and instructed him to return in one (1) week for a follow-up (R. 663-64, 691).

On March 1, 2013, Plaintiff presented to the emergency room at Stonewall Jackson Memorial Hospital with complaints of shortness of breath. He had tried his inhaler but experienced no relief. Plaintiff denied experiencing any pain; he was alert and oriented "x3" (R. 647). Dr. William Kelley conducted an examination of Plaintiff. His examination was normal except for Plaintiff's respiratory system, as he noted "bilateral wheezes but moving air" (R. 650). Plaintiff underwent an X-ray of his chest. Dr. Joseph Dorchak noted "[l]eft upper lobe infiltrate and associated pleural effusion" and "[i]n the appropriate setting, consistent with pneumonia. Recommend followup to document resolution with therapy" (R. 655). Dr. Kelley diagnosed asthma, acute exacerbation, and discharged Plaintiff home with instructions for him to follow up with Dr. Snuffer in five (5) days (R. 651, 656).

Plaintiff returned to the Stonewall Jackson Memorial Hospital emergency room on March 8, 2013, again with complaints of shortness of breath. He reported that this began after he breathed in smoke from trash being burned by his neighbors. Plaintiff denied pain (R. 633). Dr. Mario Estolano examined Plaintiff; his examination was normal except for "wheezes on expiration" (R. 635). Plaintiff underwent an X-ray of his chest. Dr. Timothy Hetzer's impression was "[p]leural and parenchymal scarring in the left lung. No definite infiltrate" (R. 642). Dr. Estolano diagnosed smoke inhalation and discharged Plaintiff to home with instructions to follow up with Dr. Snuffer in three (3) days (R. 636, 643).

On March 20, 2013, Plaintiff returned to the emergency room at Stonewall Jackson Memorial Hospital, for an asthma attack he had experienced that morning (R. 621). Plaintiff underwent an X-ray of his chest, which revealed "[n]o acute pulmonary disease" (R. 627). Dr. Kelley examined

14

Plaintiff and noted a normal examination except for "bil. wheezes speaking in short sentences" (R. 623). He diagnosed asthma, acute exacerbation, and discharged Plaintiff to home with instructions for him to follow up with Dr. Snuffer in seven (7) days (R. 624, 629).

On April 2, 2013, Plaintiff returned to the emergency room at Stonewall Jackson Memorial Hospital, with complaints of shortness of breath. He reported that perfume had "set off" his asthma that morning. Plaintiff denied any pain (R. 611). Dr. Michael Gregory examined Plaintiff and noted no abnormalities. As to Plaintiff's respiratory system, Dr. Gregory noted "[n]o respiratory distress. Lungs clear with equal breath sounds bilaterally. Breath sounds are absolutely clear with a room air pulse ox of 99%." He assessed asthma, acute exacerbation (R. 613). Plaintiff was discharged home with instructions to follow up with Dr. Snuffer within seven (7) days (R. 614, 617).

Also on April 2, 2013, Plaintiff saw NP Gibson with complaints of shortness of breath and a cough. Plaintiff stated that he had been exposed to wood smoke about two (2) months ago and had become very "short of breath and wheezy." He had been seen in the emergency room and was treated with albuterol and prednisone. Plaintiff was well for two (2) weeks but was then exposed to someone wearing "heavy perfume," which caused him to become "very wheezy and short of breath again." He was seen in the emergency room again, where he was given oral steroids. The oral steroids improved his breathing but caused him to gain weight. Upon examination, NP Gibson noted that Plaintiff had "diminished breath sounds with diffiuse [sic] wheezing throughout fields." NP Gibson assessed Hypertension; HLD hyperlipidemia; gouty arthropathy, unspecified; depression, and COPD with acute exacerbation. NP Gibson prescribed Micardis, Bystolic, Viibryd, Pulmicort, and Albuterol, and instructed Plaintiff to follow up in four (4) weeks (R. 665-66, 689-90).

Plaintiff saw Dr. Snuffer again on June 20, 2013, for another disability evaluation as well as

with complaints of "some problems with the veins in his legs." He reported that he had experienced a few asthmatic attacks because of "people burning trash" (R. 687-88, 724). Dr. Snuffer completed a General Physical form for West Virginia Department of Health and Human Services. He noted that Plaintiff was under his care for "COPD/lungs and varicose veins/circulation." Plaintiff had an antalgic gait but could "walk for short distances" (R. 658). He had psoriatic plaque on his legs, edema, and diminished breath sounds bilaterally. Plaintiff was depressed. Dr. Snuffer diagnosed trauma-induced asthma, psoriasis, and post-thoracotomy syndrome. He opined that Plaintiff was unable to work full-time because he could not be on his feet for longer than an hour because of "shortness of breath, leg drainage." He could not perform other full-time work because his pain caused him to be unable to stay in one position for "any length of time." Dr. Snuffer did not expect Plaintiff to be able to resume work (R. 659).

On October 23, 2013, Plaintiff saw Dr. Snuffer for a check-up. He complained of having shortness of breath and reported that he could "walk slowly around the block at home but ha[d] severe shortness of breath." Plaintiff noted that he had started therapy with Dr. Klein and had been diagnosed with PTSD as well as depression. Dr. Snuffer noted that Plaintiff's medical history was positive for "hypertension, gout, depression, venous stasis dermatitis, empyema with fibrosis" (R. 726). Upon examination, Dr. Snuffer noted that Plaintiff had a bilateral "mild exp wheeze" with the left greater than right. He also had several "scaly dry patches on both legs below the knees" with "1+ edema and mult small and medium varicosities." Plaintiff's bilateral peripheral pulses were diminished. Plaintiff did not go out much because of his depression; he had gained weight. He stated that he was "really depressed" and was not interested in his regular hobbies. Plaintiff avoided crowds, was paranoid about getting sick again and experiencing another infection, and did his

shopping in the middle of the night. Dr. Snuffer diagnosed Hypertension, COPD, lung laceration without mention of open wound into thorax, adjustment disorder with depressed mood, and venous stasis dermatitis. He instructed Plaintiff to follow up with him in two (2) months (R. 727).

Subsequent to that appointment, Dr. Snuffer wrote a letter to Plaintiff's attorney. Dr. Snuffer noted that Plaintiff had been seen by Dr. Orvik, who performed a pulmonary function test. That test indicated a "severe reduction in FEV1." Dr. Snuffer opined that "[d]ecrease in FEV to the level which he demonstrates on his PFT, shows severe obstructive disease in his lungs and when taken into consideration with his obesity and overall reduction in his lung functioning, he medically equals the conditions set forth by SSA's listing 3.02(A)" (R. 705-06). He further stated that Plaintiff's venous stasis disease had persisted "for over three months in spite of treatment." According to Dr. Snuffer, Plaintiff's symptoms were reduced when he elevated his legs "as high as his heart occasionally throughout the day." Dr. Snuffer had also treated Plaintiff for "several episodes of chronic back pain." He intended to refer Plaintiff to physical therapy for the lesions on his legs as well as his back. In sum, Dr. Snuffer stated:

> I believe that certainly his decline in his breathing ability since May 2011 warrant his medical disability relative to SSA's listing 3.02(A). I further noted that he has developed severe anxiety and depression as well as venous stasis changes in the lower extremities and chronic back pain, all of which, in my opinion taken in combination have placed additional significant limitation on his capacity to satisfactorily maintain work functioning

(R. 706).

ALJ Carpenter provided a Medical Interrogatory Physical Impairment(s)–Adults form to Dr. Murray Gilman, medical expert, on November 26, 2013 (R. 708-12). Dr. Gilman completed the interrogatory on December 1, 2013. He opined that Plaintiff suffered from the following

impairments: PTSD/depression; COPD; empyema s/p decortication; recurrent pneumonia; degenerative disc disease; hypertension; morbid obesity; gout; seizures; hyperlipidemia; and lichen simplex (R. 713). Dr. Gilman noted that Plaintiff's impairments, combined or separately, did not meet any of the Listings (R. 714). He found that Plaintiff could perform work at a sedentary level; specifically, Plaintiff could lift twenty (20) pounds occasionally and ten (10) pounds frequently; could stand and walk for about two (2) hours in an eight-hour workday; and could sit for six (6) hours in an eight-hour workday. Plaintiff needed to avoid heights (scaffolds and ladders) and excessive concentrations of dust, fumes, and temperature extremes. He could occasionally bend, stoop, crawl, squat, etc. Dr. Gilman noted that this RFC was applicable as of May 28, 2011, and was consistent with Dr. Orvik's recommendation (R. 715).

On February 19, 2014, Plaintiff underwent spirometry at Stonewall Jackson Memorial Hospital, after being referred to same by Dr. Snuffer. The technician who administered the test noted that Plaintiff "gave good effort." Dr. Khalid Mahmound reviewed Plaintiff's results. He noted that "[e]xpiratory flows of 60% of predicted indicate[d] moderate obstructive lung disease. Expired volume of 75% of predicted may indicate presence of restrictive lung disease . . . After Bronchodilator, total expired volume increased by .3 L., mid-expiratory flow increased by .3L/S" (R. 729-37).

Administrative Hearing

Plaintiff's hearing before ALJ Carpenter initially began on October 31, 2013 (R. 80). However, Plaintiff requested that the hearing be rescheduled to permit interrogatories to be submitted to a medical expert ("ME") (R. 92-95).

Plaintiff's full hearing was held on February 25, 2014 (R. 41). Prior to his accident, Plaintiff

had weighed 185 pounds; he had gained approximately 100 pounds since (R. 49-50). Plaintiff's driver's license expired during his hospital stay; he had never renewed it. Plaintiff had a Bachelor of Arts degree in chemistry and a Bachelor of Science degree in biology (R. 50). He resided with his best friend's apartment with his best friend; however that was "coming to an end soon." Plaintiff had not worked since May 2011; he received six months worth of "sick pay" from his union (R. 51).

When Plaintiff worked at Kroger, he worked in the delicatessen and worked on data maintenance. Data maintenance involved changing shelf signs and pricing. In the deli, Plaintiff baked, cooked, and unloaded trucks. He was not responsible for taking inventory. The heaviest item Plaintiff lifted on a regular basis was the "chicken boxes, which range[d] anywhere between 25 to 35 pounds." He unloaded trucks twice a week, which involved lifting heavier items (R. 52-54). During 2004 and 2005, Plaintiff worked part-time as an adjunct professor in biology and botany at Glenville State College. Plaintiff's classes included twenty (20) to thirty (30) students; he usually taught five (5) classes per semester (R. 54).

Plaintiff quit working in May 2011 after inhaling "fumes from a chicken fryer that had had the wrong cleaner put into it" (R. 57). Since then, he became short of breath from "[p]retty much everything" (R. 58). Plaintiff would try to run his sweeper and would need to quit "within seven to 10 minutes." Stairs were "horrible" for him. Stress could cause Plaintiff to have an asthma attack. When that occurred, he would try breathing exercises; if those did not work, he had to go to the emergency room. Plaintiff tried walking, but sometimes felt that there was "just not enough air" (R. 59).

Plaintiff experienced leg problems caused by poor blood circulation. He experienced scaly patches on his legs. According to Plaintiff, the problem was getting "progressively worse." Dr.

Snuffer had told him to use Eucerin cream on his legs; he also used prescription "wraps" to treat them (R. 60). If Plaintiff was on his feet for "very long at all," he experienced intense itching and burning, and he would scratch to the point of bleeding. The only way to relieve the pain was to elevate his legs above his heart. Plaintiff elevated his legs several times daily, from forty-five (45) minutes to an hour and fifteen (15) minutes at a time (R. 61).

Plaintiff had not smoked cigarettes since his accident; he could not "even be around somebody who smokes." He had a "really big problem" with colognes and perfumes. Plaintiff had coughed a lot since his surgery. His sinuses ran constantly, whether in winter or summer. Plaintiff had some problems with his back; he had to be careful with lifting and could not lay flat on his back (R. 63-64). Plaintiff could sit for ten (10) to fifteen (15) minutes before his legs began itching; he could only stand in place for "a matter of minutes" (R. 64). He could walk roughly half a block and could lift a gallon of milk (R. 65).

The ALJ asked the VE the following hypothetical question:

Now, if we assume an individual the same age, education, and work background as the claimant who's capable of performing sedentary work as defined in the regulations but with the following limitations. There should be a sit/stand option which would allow the person to change positions briefly for one to two minutes at least every 30 minutes; the person can lift up to 20 pounds occasionally and 10 pounds frequently; there should bed [sic] no crouching, crawling, no climbing of ladders, ropes or scaffolds; no more than occasional balancing, stooping or climbing of stairs or ramps.

There should be no concentrated exposure to extreme heat and cold; the person must avoid even occasional exposure to respiratory irritants such as dust, fumes, odors, and gases, or hazards such as dangerous moving machinery or unprotected heights. The work should be limited–just a moment, please. (Pause) The work should be limited to simple, routine, and repetitive instructions and tasks. Should be no assembly line work, no fast-paced production requirements, and no more than occasional changes in work routine or work setting.

The VE responded that such an individual could not perform Plaintiff's past work (R. 73). However, such an individual could perform work as a fishing reel assembler, with 229,000 jobs nationally and 800 regionally; a call-out operator, with 54,000 jobs nationally and 90 regionally; and a telemarketer, with 289,000 jobs nationally and 4,800 regionally (R. 74). The VE also testified that those jobs would be available to the same individual should the sit/stand option be changed to allow the person to sit or stand at will throughout the day (R. 75).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Carpenter made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2017.

2. The claimant has not engaged in substantial activity since May 28, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has had the following impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: obstructive and restrictive lung disease, status post thoracotomy, complete left lobe decortication, and drainage of empyema; degenerative changes of the thoracic spine, with a compression fracture of T11; moderate to advance degenerative disc disease at L5-S1, with facet arthrosis at the lower lumbar levels; psoriasis/venous stasis dermatitis; obesity; major depressive disorder; and posttraumatic stress disorder ("PTSD") (20 CFR 404.1520 (c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, since Mary 28, 2011, the claimant has had the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) except: afforded a sit/stand option at will; can lift 20 pounds occasionally and 10

pounds frequently; should do no crouching, crawling, or climbing of ladders, ropes or scaffolds, and should do no more than occasional balancing, stooping or climbing of stairs or ramps; should avoid concentrated exposure to extreme heat and cold; should avoid even occasional exposure to respiratory irritants, or hazards such as dangerous moving machinery or unprotected heights; limited to simple, routine and repetitive instructions and tasks; and, work should entail no assembly line, no fast-paced production requirements, and no more than occasional changes in work routine or work setting.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on August 26, 1965 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 28, 2011, through the date of this decision (20 CFR 404.1520(g)) (R. 18-35).

## IV. DISCUSSION

### A.     Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The

Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays v. Sullivan, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.      Contentions of the Parties**

Plaintiff contends:

1.    Because the ALJ's RFC is internally inconsistent then this Court must remand this claim;

2.    Because the ALJ's Step Three analysis did not account for Listing 4.11 and mischaracterized the requirements of Listing 3.07 then this case must be remanded as the ALJ's decision is not based on the correct application of the Secretary's own rules and requirements; and

3.    Because Plaintiff was hospitalized for 31 days in between June and June 2012 and the VE testified that a person could not sustain employment if that person missed over two (2) days per month, then this Court must remand this case as the ALJ failed to account for Plaintiff missing over 24 days from June 2011 to June 2012.

(Plaintiff's Brief at 6-13.)

The Commissioner contends:

1.    The ALJ reasonably assessed Plaintiff's physical RFC;

2.    The ALJ reasonably considered and appropriately described all necessary findings related to Listings 3.07 and 4.11; and

3.    The ALJ reasonably relied on the vocational evidence relative to Plaintiff's credibly established ongoing limitations of record.

(Defendant's Brief at 7-14.)

In his reply brief, Plaintiff argues:

1.    Dr. Gilman did not proclaim that Plaintiff failed to meet a Listing due to the breathing tests being unreproducible;

2.    Listing 4.11 and Listing 3.07B; and

3.    Defendant does not address the potential closed period argument provided by Mr. Pumphrey.

(Plaintiff's Reply at 1-3.)

## C.    RFC

As his first claim for relief, Plaintiff argues that the ALJ's formulation of his RFC is internally inconsistent. Specifically, Plaintiff asserts:

The ALJ does not make clear what the most Mr. Pumphrey can perform [sic]. On one hand, at most Mr. Pumphrey can perform is sedentary work. Sedentary work entails lifting 10 pounds occasionally and 5 pounds frequently.

Yet, on the other hand, the ALJ finds that the most Mr. Pumphrey can do is lift 20 pounds on an occasional basis and 10 pounds of [sic] a frequent basis. These abilities are indicative of the ability to perform Light work.

The ALJ's RFC is inconsistent with itself and leaves this Court to guess at the ALJ's thought process. The ALJ did indicate what was the most that Mr. Pumphrey was

capable of performing despite his limitations.

(Plaintiff's Brief at 7.) Plaintiff also appears to assert that the ALJ erred in relying on the opinion of medical expert Dr. Ronald Gilman, who found that Plaintiff was capable of sedentary work while lifting twenty (20) pounds occasionally and ten (10) pounds frequently, and that Plaintiff did not meet Listing 3.02A. (Id. at 7-8.) Given that Plaintiff's second contention regards the Listings, the undersigned has considered his claim regarding Listing 3.02A below.

Under the regulations, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving his RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. § 404.1545(a)(3)(claimant is responsible for providing evidence to be used to develop RFC).

As to Plaintiff's RFC, the ALJ found:

After careful consideration of the entire record, the undersigned finds that, since May

28, 2011, the claimant has had the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) except: afforded a sit/stand option at will; can lift 20 pounds occasionally and 10 pounds frequently; should do no crouching, crawling, or climbing of ladders, ropes, or scaffolds, and should do no more than occasional balancing, stooping or climbing of stairs or ramps; should avoid concentrated exposure to extreme heat and cold; should avoid even occasional exposure to respiratory irritants, or hazards such as dangerous moving machinery or unprotected heights; limited to simple, routine and repetitive instructions and tasks; and, work should entail no assembly line, no fast-paced production requirements, and no more than occasional changes in work routine or work setting.

(R. at 25.)

The regulations define "sedentary work" as follows:

Sedentary work involves **lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools**. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

404 C.F.R. § 404.1567(a) (emphasis added). After reviewing the record, the undersigned finds that the ALJ's RFC is not internally inconsistent; rather, the ALJ's finding as to lifting qualified, rather than contradicted, a sedentary RFC. As one court in the Fourth Circuit has explained:

A person who is able to lift and/or carry 10 pounds frequently and 20 pounds occasionally obviously has the ability to lift and/or carry up to 10 pounds at a time and occasionally docket files and like articles. . . . Moreover, because the ALJ found plaintiff's ability to stand and walk limited to that at the sedentary level–explicitly identifying the ability as at that level–she would have overstated plaintiff's capacity if she had characterized plaintiff as capable of performing a range of light work. . . . Indeed, the greater need to stand and walk at the light exertional level has been recognized as the principal difference distinguishing it from the sedentary exertional level. . . . Notably, the ALJ nowhere states that the lifting and carrying capacities she found for plaintiff were themselves at the sedentary level, reserving that term for the range of work plaintiff could perform and her capacity to stand and walk.

Notwithstanding the ALJ's characterization of the range of work she found plaintiff able to perform, there is no question about the lifting and carrying capacity she found plaintiff to have. She stated the capacity specifically by pounds and frequency of

activity, not only in the formal statement of plaintiff's RFC, but again in the concluding paragraph of her RFC analysis. She also specified the lifting and carrying capacity by pounds and frequency of activity in her hypotheticals to the VE, although again referring th plaintiff as having sedentary exertional capacity.

Justice v. Colvin, No. 7:13-CV-107-D, 2014 WL 3667603, at *7-8 (E.D.N.C. June 11, 2014),

adopted by 2014 WL 3667744 (E.D.N.C. July 22, 2014) (internal citations omitted). Other courts

have upheld RFCs that include lifting limitations similar to the ALJ's finding in Plaintiff's case.

See, e.g., Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Rouse v. Astrue, No. 8:11-cv-1391-

T-30AEP, 2012 WL 3744515, at *10 (M.D. Fla. Aug. 10, 2012), adopted by 2012 WL 3744508

(M.D. Fla. Aug. 29, 2012).

Plaintiff argues that the ALJ erred by relying on the opinion of medical expert Dr. Gilman

when formulating his RFC. On December 1, 2013, Dr. Gilman opined that Plaintiff could perform

work at a sedentary level, but could lift twenty (20) pounds occasionally and ten (10) pounds

frequently. (R. at 715.) Dr. Gilman's opinion as to Plaintiff's lifting and carrying capacity was

consistent with the findings of the State agency physicians. On June 13, 2012, Dr. Franyutti

determined that Plaintiff could occasionally lift and carry twenty (20) pounds and could frequently

lift and carry ten (10) pounds. (R. at 104.) On September 3, 2012, Dr. Gaziano affirmed Dr.

Franyutti's findings. (R. at 118.) Plaintiff has not pointed to any evidence contradicting these

medical records, and upon review of the record, the undersigned has not located any. Given this

evidence, the ALJ properly qualified her sedentary RFC with a finding that Plaintiff could

occasionally lift and carry twenty (20) pounds and frequently lift and carry ten (10) pounds. See

Justice, 2014 WL 3667603, at *7-8.

Notwithstanding that, even assuming *arguendo* that the ALJ erred in her statement of

Plaintiff's RFC, the undersigned finds that such error would have been harmless. "The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate disability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); Hurtado v. Astrue, C/A No. 1:09-1073-MBS-SVH, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("[T]he court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision."). During the administrative hearing, the ALJ asked the VE the following hypothetical:

> Now, if we assume an individual the same age, education, and work background as the claimant who's capable of performing sedentary work as defined in the regulations but with the following limitations. There should be a sit/stand option which would allow the person to change positions briefly for one to two minutes at least every 30 minutes; the person can lift up to 20 pounds occasionally and 10 pounds frequently; there should bed [sic] no crouching, crawling, no climbing of ladders, ropes or scaffolds; no more than occasional balancing, stooping or climbing of stairs or ramps.

> There should be no concentrated exposure to extreme heat and cold; the person must avoid even occasional exposure to respiratory irritants such as dust, fumes, odors, and gases, or hazards such as dangerous moving machinery or unprotected heights. The work should be limited–just a moment, please. (Pause) The work should be limited to simple, routine, and repetitive instructions and tasks. Should be no assembly line work, no fast-paced production requirements, and no more than occasional changes in work routine or work setting.

(R. at 73.) The VE responded that Plaintiff could perform the sedentary jobs of fishing reel assembler, call-out operator, and telemarketer. (R. at 74.) A fishing reel assembler involves "[e]xerting up to 10 pounds of force occasionally . . . and/or a negligible amount of force frequently." Dictionary of Occupational Titles ("DOT") 732.684-062, 1991 WL 679850. A call-out operator and

telemarketer both involve the same. <u>DOT</u> 237.367-014, 1991 WL 672186 (call-out operator); <u>DOT</u> 299.357-014, 1991 WL 672624 (telemarketer). Accordingly, the jobs that the VE identified required only sedentary-level lifting and carrying in the first instance. Therefore, even if one assumes that the ALJ erred in her determination of Plaintiff's RFC, the undersigned finds that remand is unnecessary. <u>See</u> <u>Justice</u>, 2014 WL 3667603, at *8 (the occupations identified by the VE at Step Five all required sedentary-level lifting and carrying); <u>cf.</u> <u>Spiva v. Astrue</u>, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.").

## D.     Listings 3.02, 4.11 and 3.07

Plaintiff also alleges that the ALJ committed several errors when analyzing his impairments under the Listings. First, Plaintiff argues that the ALJ erred by relying on Dr. Gilman's opinion to determine that he did not meet Listing 3.02A. (Plaintiff's Brief at 8.) Second, Plaintiff asserts that the ALJ's Step Three analysis failed to account for Listing 4.11. (<u>Id.</u> at 8-10.) Finally, Plaintiff states that the ALJ mischaracterized the requirements of Listing 3.07B. (<u>Id.</u> at 10-13.) The undersigned has considered each of these arguments in turn.

A claimant bears the burden of demonstrating that his impairment meets or medically equals a listed impairment. <u>Kellough v. Heckler</u>, 785 F.2d 1147, 1152 (4th Cir. 1986). As the Supreme Court has stated,

> The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity." . . . The reason for this difference between the listings' level of severity

and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

Sullivan v. Zebley, 493 U.S. 521, 532 (1990) (internal citations omitted).

Nevertheless, when evaluating whether a claimant meets one or more of the listed impairments, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). "This requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairments in more than a "summary way." Id. at 1173. "The ALJ is required to give more than a mere conclusory analysis of the plaintiff's impairments pursuant to the regulatory listings." Fraley v. Astrue, No. 5:07CV141, 2009 WL 577261, at *25 (N.D. W. Va. Mar. 5, 2009) (citing Warner v. Barnhart, Civil Action No. 1:04-cv-8, Docket No. 18 at 7-9, 11 (Final Order of Stamp, J., filed Mar. 29, 2005)). In Warner, Judge Stamp found that the ALJ "simply restate[d] verbatim the language of Listing 1.04 and Listing 14.09. Without analysis, the ALJ dismisse[d] the applicability of the listings:

> The undersigned does not believe that the claimant has nerve root compression with limitation of motion of the spine, motor loss with sensory or reflex loss, evidence of inflamed arachnoidal tissue resulting in the need for change of position or posture every two hours, or evidence of stenosis that results in an inability to ambulate effectively. The objective medical evidence also does not show that the claimant had a history of joint pain, swelling and tenderness, with signs of current physical examination of joint inflammation or deformity in two or more major joints resulting in an inability to ambulate effectively or an inability to perform fine and gross movements effectively. The undersigned finds that the claimant did not meet or medically equal any physical listing.

Warner, Civil Action No. 1:04-cv-8, Docket No. 18 at 8.

1.     **Listing 3.02A**

Plaintiff first asserts that the ALJ erred in relying on Dr. Gilman's opinion to determine that

he did not meet Listing 3.02A.  That Listing requires "[c]hronic obstructive pulmonary disease, due

to any cause, with the $FEV_1$ equal to or less than the values specified in table I corresponding to the

person's height without shoes."  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Furthermore, Listing 3.00E

provides, in pertinent part:

> The results of spirometry that are used for adjudication under paragraphs A and B of
> 3.02 and paragraph A of 3.04 should be expressed in liters (L), body temperature and
> pressure saturated with water vapor (BTPS).  The reported one-second forced
> expiratory volume ($FEV_1$ ) and forced vital capacity (FVC) should represent the
> largest of at least three satisfactory forced expiratory maneuvers.  Two of the
> satisfactory spirograms should be reproducible for both pre-bronchodilator tests and,
> if indicated, post-bronchodilator tests.  A value is considered reproducible if it does
> not differ from the largest value by more than 5 percent or 0.1 L, whichever is
> greater.  The highest values of the $FEV_1$  and FVC, whether from the same or
> different tracings, should be used to assess the severity of the respiratory impairment.

As to Listing 3.02A, the ALJ stated as follows

> More specifically in terms of listing *3.02*, the claimant has contended that his
> obstructive and restrictive lung disease, in combination with his obese body habitus,
> medically equals listing *3.02* (Ex. 12E).  In so averring, the claimant has essentially
> relied upon a singular pulmonary function study undergone in June 2012; a study
> which the claimant's primary care provider Robert Snuffer, D.O. averred, when
> considered in combination with the claimant's obese body habitus, showed that the
> claimant medically equaled the criteria of listing *3.02(A)* (Exs. 11F and 17F).  Yet,
> within the claimant's own assertion of medically equaling the listing, he reported that
> the best forced expiratory volume ($FEV_1$ ) reading demonstrated in his pulmonary
> testing was 2.08 liters; a reading which was not less than or equal to listing level
> requirements (i.e., 1.65) when considering the claimant's height (i.e., 72" or more)
> (*Id.*).  The largest of $FEV_1$ readings is used in assessing listing level decisions (i.e.,
> *3.00E*).

> In December 2013, medical expert Murray Gilman, M.D. examined the claimant's
> medical records, including the same pulmonary function test relied upon by Dr.
> Snuffer, and considered all of the claimant's physical impairment co-morbidities,
> including the effects of obesity (Ex. 20F).  Dr. Gilman, who specifically addressed

the issue of obesity, opined that the claimant's conditions do not meet or equal listing level requirements. Furthermore, Dr. Murray opined that the claimant's oxygen saturations were normal, the claimant did not require oxygen therapy at home, and the claimant had demonstrated no recurrent hospitalizations continuing throughout the period at issue due to respiratory impairment.

The undersigned further notes that subsequent pulmonary function testing of the claimant performed in February 2014 continued to reflect $FEV_1$ levels well outside of listing levels requirements for the claimant's height (i.e., equal to or less than 1.65) (Ex. 23F). More specifically, the claimant was evidenced to have a pre-bronchodilator $FEV_1$ of 1.96 and a post-bronchodilator $FEV_1$ of 2.08 (*Id.*).

The claimant's obstructive and restrictive lung disease, in combination with the effects of his obesity, has been evaluated under listing 3.02 and this condition does not meet or medically equal the clinical criteria of this listing. More specifically, the claimant has not been proved to have a $FEV_1$ equal to or less than listing level. Moreover, the longitudinal evidence of record also failed to prove, forced vital capacity (FVC) equal to or less than listing level requirements (i.e., *3.02B*). More specifically, FVC values were regularly shown to exceed 4.00 and above; listing level required a value equal to or less than 1.85 (Exs. 11F and 23F). Finally, while gas exchange was not measured in initial pulmonary function testing, recent testing revealed arterial blood gas values of $PO_2$ and simultaneously determined $PCO_2$ likewise not equal to or less than listing level requirements (i.e., *3.02C*). More specifically, the claimant was evidenced to have a $PCO_2$ of 33.1 and $PO_2$ of 80.3 (Ex. 23F). The claimant's demonstrated $PO_2$ would have needed to be equal to or less than 62 for listing levels to be met or equaled.

In sum, the undersigned finds that the severity of the claimant's obstructive and restrictive lung disease, considered singly and in combination, does not meet or medically equal any of the criteria of listing *3.02*. In so finding, the undersigned accorded great weight to the opinion of medical expert Dr. Gilman (Ex. 20F). Although a non-treating physician, Dr. Gilman is an expert familiar with the regulations and evidentiary requirements. Moreover, Dr. Gilman is an expert in pulmonary medicine with more than 30 years of pulmonary experience (Ex. 21F). No weight was accorded to the opinion offered by the claimant's primary care provider, Dr. Snuffer, that the claimant medically equaled listing *3.02A* (Ex. 17F). This opinion is wholly inconsistent with and unsupported by the medical evidence of record, and wholly undermined by the expert opinion of Dr. Gilman. Dr. Snuffer is a general practitioner and not an expert in pulmonary.

(R. at 21-22.)

Plaintiff argues that the ALJ erred in relying on Dr. Gilman's opinion because he "relied on

a pulmonary function test ("PFT") that was of 'poor quality' (as noted by Dr. Gilman) and not 'reproducible' (as noted by the PFT itself). . . . So, Dr. Gilman's findings are faulty based on the face of the record." (Plaintiff's Brief at 8.) The undersigned agrees with Plaintiff that Dr. Gilman noted that the June 7, 2012, PFT was "of poor quality." (R. at 714.) Furthermore, the June 7, 2012 PFT was not reproducible. (R. at 603.) However, an absence of reproducible test results means that Plaintiff does not satisfy Listing 3.02A. See Chang v. Astrue, No. 1:11-CV-02002-JLT, 2012 WL 4661166, at *5-6 (C.D. Cal. Oct. 1, 2012) ("Because Plaintiff's test results were not reproducible, they fail to satisfy the testing requirements of the Listings.").

The undersigned notes that nowhere did the ALJ cite Dr. Gilman's opinion that the June 7, 2012 PFT was "of poor quality" when determining that Plaintiff did not meet the Listing. Even assuming that the ALJ erred in greatly relying on Dr. Gilman's opinion, the undersigned notes that the June 7, 2012 PFT results still did not meet the requirements of Listing 3.07A. The record states that Plaintiff is 73" tall. (R. at 705.) To meet Listing 3.02A, Plaintiff's largest $FEV_1$ needed to be equal to or less than 1.65 liters. 20 C.F.R. Part 404, Subpt. P, App. 1, Listings 3.00E and 3.02A, Table I. The largest $FEV_1$ result from the June 7, 2012 PFT was 2.08 liters. (R. at 603.) That result remained the same on his February 19, 2014 PFT. (R. at 729.) Given these results, it is clear that Plaintiff has not satisfied the requirements of Listing 3.02A. Furthermore, even if the largest $FEV_1$ results from Plaintiff's June 7, 2012 PFT equaled or was less than 1.65 liters, the results would have been disqualified for not being reproducible. See Nichols v. Astrue, No. 08-460-ART, 2009 WL 1253671, at *5 (E.D. Ky. May 4, 2009) (noting that a rating of 0.80 would be "sufficient to satisfy the listing" but "was not reproducible as required by the regulations"). Accordingly, the undersigned finds that the ALJ did not err in determining that Plaintiff did not satisfy Listing 3.02A.

## 2.    Listing 4.11

Plaintiff next asserts that the ALJ failed to account for Listing 4.11B, which requires "[c]*hronic venous insufficiency* of a lower extremity with incompetency or obstruction of the deep venous system" in addition to "[s]uperficial varicosities, stasis dermatitis, and either recurrent ulceration or persistent ulceration that has not healed following at least 3 months of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1; see also Chaplick v. Colvin, No. 13-745, 2014 WL 4258333, at *18 (M.D. Pa. Aug. 26, 2014) (describing Listing 4.11's sets of requirements).

In his brief, Plaintiff argues that the record shows a diagnosis of venous stasis dermatitis that persisted over three (3) months in spite of prescribed treatment. (Plaintiff's Brief at 9-10.) On December 27, 2012, Plaintiff saw NP Gibson with complaints of dry, itchy patches on his upper and lower legs. He had scratched so much that he had developed "thick plaque in areas on the right shin." (R. at 661, 693-94.) NP Gibson assessed lichen simplex chronicus and prescribed triamcinolone acetonide ointment. (R. at 662.) Plaintiff continued to experience "thick itching patches on the shins and right thigh" when he returned to see NP Gibson on January 2, 2013; he was still using the ointment. (R. at 664, 691.) NP Gibson noted a "2x2 inch dark red patch with yellow/silver scale" on Plaintiff's right shin on April 2, 2013. (R. at 666, 689.) Plaintiff was still using triamcinolone acetonide ointment. (R. at 689.) On June 20, 2013, Plaintiff told Dr. Snuffer that he was still having problems with the veins in his legs; he was still using the ointment. (R. at 687.) In a undated letter to Plaintiff's attorney, Dr. Snuffer noted that the "venous stasis disease in [Plaintiff's] legs has persisted for over three months in spite of treatment." (R. at 706.)

Even assuming Plaintiff meets the latter requirement of Listing 4.11B, the record contains no evidence that Plaintiff's condition constitutes chronic venous insufficiency "of a lower extremity

with incompetency or obstruction of the deep venous system" as required by the Listing. See Hellyer v. Colvin, No. 2:13-CV-00802, 2014 WL 3530856, at *11 (S.D. Ohio July 15, 2014) (Abel, Mag. J.) ("Plaintiff does not point to any evidence in the record documenting chronic venous insufficiency of a lower extremity 'with incompetency or obstruction of the deep venous system' and the administrative law judge did not err by failing to explicitly discuss Listing 4.11B."). Put simply, the undersigned finds that records detailing Plaintiff's diagnoses and treatment are insufficient to satisfy Listing 4.11B.

One court in the Fourth Circuit has noted that "an ALJ is required to discuss listed impairments and compare them individually to Listing criteria *only when* there is 'ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments.'" Richardson v. Comm'r of Soc. Sec., No. SAG-13-468, 2014 WL 996860, at *2 (D. Md. Mar. 12, 2014) (quoting Ketcher v. Apfel, 68 F. Supp. 2d 629, 645 (D. Md. 1999)); see also Parker v. Astrue, No. 5:10-CV-395-D, 2011 WL 2981867, at *4 (E.D.N.C. June 16, 2011), adopted by 2011 WL 2975922 (E.D.N.C. July 22, 2011) ("While the ALJ did not reference this listing specifically, his finding that plaintiff lacks an impairment or combination of impairments that meets or medically equals any listing encompasses Listing 4.11."). Here, the ALJ considered Plaintiff's skin condition, as her decision contains a detailed discussion of Listings 8.04 and 8.05. Given that there is not ample evidence in the record to support a determination that Plaintiff's impairment met or equaled Listing 4.11B, the undersigned finds that the ALJ did not err by not discussing that Listing in her decision.

3. **Listing 3.07B**

As the last part of his second claim for relief, Plaintiff asserts that the ALJ "mischaracterized

the requirements of Listing 3.07B" in her decision. (Plaintiff's Brief at 10.) Specifically, Plaintiff argues that "[a]s a result of this mischaracterization, Mr. Pumphrey was forced to show that he had to have hospitalizations/physician intervention *every month* instead of 'once every two months or at least six times a year.'" (Id.)

Listing 3.07B requires "[*b*]*ronchiectasis* {demonstrated by appropriate imaging techniques)" along with

> [e]pisodes of bronchitis or pneumonia or hemoptysis (more than blood-streaked sputum) or respiratory failure (documented according to 3.00C), requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each inpatient hospitalization for longer than 24 hours for treatment counts as two episodes, and an evaluation of at least 12 consecutive months must be used to determine the frequency of episodes.

20 C.F.R. Pt. 404, Subpt. P, App.1.

Plaintiff's hospitalizations for this condition can be summarized as follows: Plaintiff was hospitalized at UHC from May 16 until May 20, 2011. (R. at 320.) Plaintiff was again hospitalized at UHC from May 28 until June 8, 2011. Fourteen (14) days later, on June 22, 2011, Plaintiff returned to UHC; he remained there until June 24, 2011. (R. at 498, 522.) From there, Plaintiff was directly transferred to Ruby Memorial Hospital, where he stayed until July 6, 2011. (R. at 514, 517, 685.) Given the transfer, Plaintiff was continuously hospitalized from June 22 until July 6, 2011. Plaintiff had no further hospitalizations during this twelve (12)-month period.

In his brief, Plaintiff argues the following:

> Here, from June 2011 to June 2012, Mr. Pumphrey spent 31 days (one entire month) off and on in the hospital under the care of doctors for complications with pneumonia, emphysema, bronchitis, and decortication of his lungs. If a hospitalization of 24 hours counts as two "episodes," then Mr. Pumphrey showed at least 15 episodes between June 2011 and June 2012.

The dates of Mr. Pumphrey's hospitalizations are as follows:

-May 16, 2011 to May 20, 2011 (four 24 hour periods (8 episodes) Tr. 320;

-May 28, 2011 to June 8, 2011 (twelve 24 hour periods) (24 episodes) Tr. 433;

-June 22, 2011 to June 24, 2011 (two 24 hour periods) (4 episodes) Tr. 473;

-June 24, 2011 to July 6, 2011 (thirteen 24 hour episodes) (26 episodes) Tr. 514;

As such, Mr. Pumphrey met Listing 3.07B.

(Plaintiff's Brief at 12.)

As an initial matter, the undersigned notes that Plaintiff's application for DIB alleges a disability onset date of May 28, 2011. (R. at 212, 236.) Given this, the relevant period at issue is May 28, 2011, until March 7, 2014, the date of the ALJ's decision. Accordingly, his period of hospitalization from May 16 until May 20, 2011, does not count for purposes of considering whether he met the hospitalization requirement of Listing 3.07B. Cf. Grunwald v. Astrue, No. 2:10-CV-440-FtM-DNF, 2011 WL 4552352, at *7 (M.D. Fla. Sept. 30, 2011) ("Therefore, substantial evidence supports the ALJ's finding that during the relevant period, Plaintiff's impairments did not meet *all criteria* of Listing 1.04A.").

Furthermore, while Plaintiff argues that the ALJ mischaracterized the requirements for Listing 3.07B, he himself has mischaracterized the calculation regarding hospitalizations. As noted above, Plaintiff's calculation presupposes that every additional 24-hour period beyond the initial 24-hour period for a hospitalization adds another two "episodes" to his total. This is simply not so. The Listing's terms clearly state that "[e]ach in-patient hospitalization for longer than 24 hours for treatment counts as two episodes," 20 C.F.R. Pt. 404, Subpt. P, App. 1, not two episodes per 24-hour

period.  See Holland v. Massanari, 152 F. Supp. 2d 929, 935 (W.D. Tenn. 2001) (noting that for purposes of Listing 3.07B, claimant "had been hospitalized for eight days in early 1997 (two episodes), for roughly five days in late 1998 (two episodes), and for less than a day on December 27, 1999").

Accordingly, Plaintiff's hospitalization from May 28 to June 8, 2011, counts as two episodes, and his hospitalization from June 22 to July 6, 2011, counts as two episodes.  Plaintiff argues that his hospitalization from June 22 to 24, 2011 should count separately from his hospitalization from June 24 to July 6, 2011.  (Plaintiff's Brief at 12.)  As noted above, on June 24, 2011, Plaintiff was transferred directly from UHC to Ruby Memorial Hospital for further treatment.  Given that there was no intervening discharge, the undersigned finds that the period from June 22 to July 6, 2011, should only count as two episodes, not four.  Given this, Plaintiff only experienced four (4) episodes requiring physician intervention.  Accordingly, he did not experience six (6) episodes in a twelve (12)-month period, as required by Listing 3.07B, in the relevant period.

As to Listing 3.07B, the ALJ wrote:

> More specifically in terms of listing *3.07*, the claimant, four days prior to his second hearing, contended that he met listing *3.07B*.  He based this contention on a brief period of treatment for various respiratory conditions such as pneumonia and empyema between May 2011 and July 2011 (Exs. 17E, 1F, 3F, 4F, and 6F). However, although the record reflected a brief period of significant treatment, **listing 3.07B is not met or equaled as the claimant was not evidenced, outside of this brief period of treatment, to have experienced 12 consecutive months of prolonged symptomatic episodes of, for example, bronchitis, pneumonia, hemoptysis, or respiratory failure, lasting one or more days and requiring physician intervention through intensive treatment** (Exs. 1F-23F).  In fact, the claimant acknowledged as much, having averred that "the wording of the Listing (i.e., *3.07B*) . . ., does not encompass [the claimant's] condition" (Ex. 17E/2).  The undersigned finds that the severity of the claimant's respiratory impairment, considered singly and in combination, did not meet or equal any of the criteria of listing *3.07*.

(R. at 22-23 (emphasis added).)  The undersigned finds that the ALJ's choice of language does not clearly set forth the requirements of Listing 3.07B, as a reasonable reader could assume, from the ALJ's discussion, that a claimant must show twelve (12) consecutive months that required physician intervention.  Nevertheless, as discussed above, the ALJ properly determined that Plaintiff did not meet Listing 3.07B because he had not experienced six (6) episodes.  Accordingly, the undersigned finds that the ALJ's choice of language, insomuch as it can be characterized as error, is harmless. The undersigned has already noted that a court "will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate disability determination." Tommasetti, 533 F.3d at 1038.  Accordingly, remand for the ALJ to refine her discussion of Listing 3.07B is unnecessary.

## E.      Closed Period of Disability

As his last claim for relief, Plaintiff asserts that his case must be remanded " so the ALJ can address the absences issue identified by the VE and satisfied by Mr. Pumphrey."  (Plaintiff's Brief at 13.)  Specifically, Plaintiff states that he was hospitalized for thirty-one (31) days between June 2011 and June 2012, and that the ALJ "does not indicate whether or not she considered these absences relative to a closed period from June 2011 to June 2012." (Id.)

It is the policy of the Social Security Administration to establish a closed period of disability where evidence indicates that a claimant was disabled for a continuous period of twelve (12) months, even if the claimant is no longer disabled by the time a determination is made.  See Program Operations Manual System ("POMS") DI § 25510.001.  "The ALJ is required to consider a closed period of disability if evidence in the record supports a finding that a person is disabled for a period of not less than twelve months."  Rosales v. Colvin, No. CV-12-1550-PHX-GMS, 2013 WL

1410387, at *4 (D. Ariz. Apr. 8, 2013); see also Price v. Colvin, 2014 WL 3798966, at *21 (D.S.C. July 31, 2014).

As noted above, the relevant period began on May 28, 2011, Plaintiff's alleged onset date. During the year following that date, Plaintiff was hospitalized from May 28 to June 8, 2011, and June 22 to July 6, 2011, for a total of twenty-seven (27) days. Nevertheless, the record indicates that he did not have much medical treatment from July to May, 2012. For example, Plaintiff had a follow-up appointment as part of the thoracic surgery clinic on July 18, 2011. At that appointment, he reported that he was "doing well" and felt "much stronger." (R. at 570.) A little more than a month later, on August 29, 2011, Plaintiff saw Dr. Snuffer with complaints of being short of breath. (R. at 678-79.) He returned to the thoracic surgery clinic on September 19, 2011. At that time, he was "fully functional" and had been "doing well." (R. at 573.) Plaintiff had no medical treatment again until November 29, 2011, when Dr. Snuffer saw him for weakness after surgery. (R. at 575-76.) Plaintiff began physical therapy on January 10, 2012, but the record does not indicate whether he continued with such therapy after that date. (R. at 579-86.) He saw Dr. Snuffer again on February 2, 2012, for "some pain and endurance issues." (R. at 577.) Plaintiff did not have medical treatment again until June 7, 2012, when he had an X-ray of his lumbar spine taken. (R. at 594.)

The undersigned finds that Plaintiff has ignored the fact that in order to be entitled to consideration for a closed period of disability, he must show that he was disabled "for a period of **not less** than twelve months." Rosales, 2013 WL 1410387, at *4. The VE testified that the acceptable level of absenteeism would be "one day a month or less." (R. at 76.) While Plaintiff certainly missed more than one (1) day from May 28 to July 6, 2011, the record, as indicated above, demonstrates that from July 6, 2011, until May 28, 2012, he underwent medical treatment, on

average, one day per month. Furthermore, no evidence suggests that Plaintiff could not work during this closed period. Notably, on September 19, 2011, Plaintiff told Dr. Oduntan that he planned to return to work. (R. at 573.) On February 2, 2012, Dr. Snuffer noted that Plaintiff could "go back [to work\ part time or light duty" if Plaintiff was "ok" in "late March." (R. at 577.) Likewise, none of the opinion evidence from consultative examiner Dr. Orvik or State agency physicians Drs. Franyutti and Gaziano even suggested that Plaintiff should be considered disabled from May 28, 2011, until May 28, 2012. Furthermore, Dr. Gilman, the medical expert, stated that his formulated RFC was applicable as of May 28, 2011, Plaintiff's alleged onset date. (R. at 715.)

Given this evidence, the undersigned finds that Plaintiff has not shown that he was disabled "for a period of not less than twelve months" to be considered for a closed period of disability. Rosales, 2013 WL 1410387, at *4. Accordingly, the undersigned finds that the ALJ did not err in failing to explicitly consider a closed period of disability from May 28, 2011 until May 28, 2012.

## V. CONCLUSION

In sum, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff was not disabled. Specifically, the ALJ did not err when she determined that Plaintiff could perform sedentary work, but qualified that RFC with a finding that Plaintiff could perform the lifting and carrying requirements of light work. Furthermore, the ALJ neither erred in finding that Plaintiff did not meet Listings 3.02A and 3.07B, nor did she err in failing to consider Listing 4.11. Finally, the ALJ did not err in failing to explicitly consider a closed period of disability from May 28, 2011 until May 28, 2012.

## VI. RECOMMENDED DECISION

For the reasons stated above, I find that the Commissioner's decision denying the Plaintiff's

application for DIB is supported by substantial evidence. I accordingly recommend the Defendant's

Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment

be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the

Report and Recommendation to which objection is made, and the basis for such objection.  A copy

of such objections should also be submitted to the Honorable Gina M. Groh, United States District

Judge.  Failure to timely file objections to the Report and Recommendation set forth above will

result in waiver of the right to appeal from a judgment of this Court based upon such Report and

Recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984),

cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn,

474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to

counsel of record.

Respectfully submitted this _6_ day of November , 2014.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE